J-A21035-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| N.T. (N.K.A. T.) | : | No. 353 WDA 2017 |

Appeal from the Order entered March 2, 2017
In the Court of Common Pleas of Allegheny County
Family Court at No:  FD 06-9214-002

BEFORE:   BENDER, P.J.E., OLSON, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 16, 2017**

J.D. ("Father") appeals from the March 2, 2017 order in the Court of Common Pleas of Allegheny County that granted, in part, the petition of N.T. (N.K.A. T.) ("Mother"), to enforce the child custody order issued in the Kobe Family Court, Japan, pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), 23 Pa.C.S. § 5401, *et seq.*, with respect to the parties' son, L.N.D.[1]  In addition, the March 2, 2017 order vacated the prior orders entered in the Allegheny County Court of Common Pleas awarding custody to Father.  Upon careful review, we affirm.

_____

[1] L.N.D. was born in November of 2001.  At the time of the subject proceedings, L.N.D. was fifteen years old.

For a recitation of the complete factual and procedural history of this case, we refer the reader to the trial court's comprehensive opinion pursuant to Pa.R.A.P. 1925(a), which the testimonial and documentary evidence supports. *See* Trial Court Opinion, 4/11/17, at 1-14. As such, we adopt it herein. *Id.*

By way of background, Father, who was born in Allegheny County, Pennsylvania, and Mother, who was born in Japan, were married in 1994. Trial Court Opinion, 4/11/17, at 1. Their children, L.N.D., and his older brother, J.L.D.,[2] were born in Japan. *Id.* L.N.D. lived in Japan all of his life, but he traveled to Allegheny County at times with Father to visit his paternal relatives, *inter alia*. *Id.*

In 2005, Mother and Father obtained a divorce decree in Japan. *Id.* at 2. In February of 2005, they entered into a legally binding custody agreement in Japan whereby they shared physical custody of L.N.D., and Mother had "parental authority" over L.N.D.[3] *Id.* In January of 2007, Mother and Father participated in a Japanese custody mediation, which

---

[2] J.L.D., who was born in August of 1998, is an adult, and is not a subject of this appeal. As such, the trial court did not include J.L.D. in its recitation of the procedural history of this case.

[3] With respect to their 2005 Japanese custody agreement, and the subsequent Japanese child custody orders, *infra*, the parties agree that "parental authority" relates to the concept of legal custody in Pennsylvania child custody law. *See* Father's Brief at 3-4; Mother's Brief at 3, n. 1; Father's reply brief at 4-5.

resulted in an agreement that Father would have "parental authority" over L.N.D., and that the parties would continue to share physical custody. *Id.* at 4.

On November 3, 2006, Father initiated a custody action in the Allegheny County Court of Common Pleas ("trial court"). Father alleged, in part, pursuant to the 2005 Japanese custody agreement, that L.N.D. was in his care and custody for greater than one-half of the time. *Id.* at 2; Petition to Confirm Custody, 11/3/06, at ¶ 10. Specifically, Father alleged that L.N.D. was in his custody in Allegheny County from July 25, 2006, through November 3, 2006, the date Father filed the custody complaint. Trial Court Opinion, 4/11/17, at 3. Father requested primary physical and legal custody based on L.N.D. having "lived throughout [his] li[fe] in Pennsylvania." *Id.* The trial court explained, "Mother did not appear to contest" Father's custody complaint, and the trial court granted his request by order dated November 3, 2006. *Id.* Importantly, Father never sought to enforce the trial court's order in Japan, where he and L.N.D. had subsequently returned. *Id.* at 4.

On September 26, 2012, Mother filed a custody action in the Kobe Family Court, Japan, wherein she requested "parental authority" and custody of L.N.D. *Id.* at 5. Father filed his own petitions in Japan, wherein he requested, *inter alia*, enforcement of his "parental authority" and full custody. *Id.* In fact, Father alleged that Mother sexually abused L.N.D.,

which caused L.N.D. to develop dissociative identity disorder. *See* Kobe Family Court Decision and Order, 3/20/15, at 12.

By order dated March 20, 2015, the Kobe Family Court granted Mother's request for "parental authority" and for physical custody of L.N.D. Trial Court Opinion, 4/11/17, at 9. The Kobe Family Court found, *inter alia*, after full investigation, that Mother did not sexually abuse L.N.D. *See* Kobe Family Court Decision and Order, 3/20/15, at 14. Further, the Kobe Family Court found that L.N.D. does not suffer from dissociative identity disorder or any other mental disorder. *Id.* Father appealed the custody order to the Osaka High Court, Tenth Civil Division, Japan, which affirmed the order on August 20, 2015. *See* Osaka High Court, Tenth Civil Division, Decision and Order, 8/20/15. Thereafter, Father filed an appeal to the Second Petty Bench, Supreme Court, Japan, which, by unanimous opinion, dismissed the appeal by order dated December 16, 2015. *See* Second Petty Bench, Supreme Court, Order, 12/16/15.

After the January 2007 Japanese custody mediation agreement, as well as during the pendency of the child custody litigation commenced by Mother in Japan in September 2012, Father filed multiple custody petitions in the trial court. Father omitted material facts in his petitions. Specifically, Father did not aver "anything about the parties' 2007 Japanese mediation . . . agreement regarding shared physical custody, Mother's initiation of Japanese legal proceedings in 2012, Father's own and subsequent initiation

of Japanese legal proceedings, that the parties had undergone multiple Japanese custody mediations, or that the Japanese legal proceedings were ongoing."[4] Trial Court Opinion, 4/11/17, at 6.

During the pendency of Father's appeals of the custody order in Japan, Father continued to present motions to the trial court seeking relief "without mentioning the Japanese legal proceedings or that Mother had actually been awarded parental authority and physical custody of [L.N.D.] in Japan." *Id.* at 9 (citation to record omitted).

Finally, in July of 2016, Father presented an *ex parte* emergency motion in the trial court, wherein he alleged, *inter alia*, that L.N.D. would be traveling with Mother in Canada in August of 2016. *Id.* at 10. Father requested that the trial court issue an order directing the Canadian authorities to, in part, transfer L.N.D. from Mother's custody to his physical custody, which the trial court granted. *Id.* at 10-11. As such, in August of 2016, Father obtained custody of L.N.D. in Canada, and they came to Pennsylvania. *Id.* at 11.

_____

[4] In March of 2009, and again in June of 2013, Father requested clarification of the 2006 custody order, initially seeking primary legal and physical custody of L.N.D., and then seeking sole legal and physical custody of L.N.D. Trial Court Opinion, 4/11/17, at 4, 6. On May 24, 2013, and July 5, 2013, Father filed petitions for contempt against Mother. *Id.* at 5, 7. In December of 2013, Father filed a protection from abuse ("PFA") petition against Mother, wherein he alleged that Mother was sexually assaulting L.N.D. *Id.* at 7. The trial court entered orders granting all of Father's requested relief.

In September of 2016, Mother filed the subject petition in the trial court, wherein she requested that it (1) enforce the Japanese custody order; (2) vacate the trial court's previous custody orders; and (3) obtain sanctions against Father for failure to disclose the Japanese proceedings to the court. The trial court held an evidentiary hearing on October 14, 2016, November 18, 2016, January 27 and 30, 2017, February 3, 7, and 9, 2017. The trial court summarized the parties' arguments as follows.

Mother contends she is entitled to enforcement of the Japanese order pursuant to the [UCCJEA], specifically 23 Pa.C.S. §§ 5405 [(International application of chapter)], 5448 [(Expedited enforcement of child custody determination)], and 5453 [(Duty to enforce)]. Mother further argues that Father's custody orders entered in [the trial] [c]ourt should be afforded no weight or merit as (i) [the trial] [c]ourt did not have jurisdiction to enter them under the UCCJEA, see 23 Pa.C.S. § 5421(a) [(Initial child custody determination)]; (ii) even if [the trial] [c]ourt had jurisdiction to enter them, it no longer has such jurisdiction, see 23 Pa.C.S. § 5424 [(Temporary emergency jurisdiction)]; and (iii) should the foregoing two positions fail, jurisdiction should nevertheless be declined pursuant to 23 Pa.C.S. § 5427 [(Inconvenient forum)].

Father rejects Mother's arguments, contending, among other things, that (i) [the trial] [c]ourt had jurisdiction to initially enter the November 2006 custody order; (ii) [the trial] [c]ourt has never lost jurisdiction; (iii) the Japanese courts, accordingly, never had jurisdiction to enter the custody order made final in 2015 since jurisdiction has always resided in [the trial] [c]ourt; (iv) the Japanese legal process and system denied Father[,] and will continue to deny Father[,] important legal and human rights, including the right to cross-examine Mother and to have joint custody of [L.N.D.]; and (v) [the trial] [c]ourt may invoke emergency jurisdiction under the UCCJEA should the foregoing arguments lack merit.

Order, 3/2/17, at 7.

- 6 -

By order dated March 2, 2017, the trial court granted Mother's petition, in part, as follows:

1) Mother's Petition is granted in the following respects: the Japanese custody order made final on December 16, 2015 shall be enforced, and [the trial court's] orders awarding custody of [L.N.D.] to Father are hereby vacated due to the lack of initial, continuing, or emergency jurisdiction.

2) The Japanese legal proceedings did not deprive Father of notice or the opportunity to be heard.

3) The Japanese child custody laws do not violate fundamental principles of human rights.

4) The parties' claims concerning sanctions and attorneys' fees are preserved for future proceedings.

Order, 3/2/17, at 8.

Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on April 11, 2017.

Father presents the following issues for our review:

a. Whether the trial court erred by finding that there was not Emergency Jurisdiction under the UCCJEA[?]

b. Whether the trial court erred by finding that it did not have subject matter jurisdiction and/or finding that subject matter jurisdiction was lost[?]

c. Whether the trial court erred by vacating any protection from abuse orders[?]

d. Whether the trial court erred in failing to find that [M]other waived her challenge to subject matter jurisdiction[?]

e. Whether the trial court erred by denying [F]ather the right to call witnesses, such as Dr. Bruce Chambers and Annette Tierney as applied to emergency jurisdiction[?]

f. Whether the trial court erred by failing to admit certain evidence and testimony of the child's abuse[?]

g. Whether the trial court erred by not finding that the Japanese court lacked subject matter jurisdiction[?]

h. Whether the trial court erred by finding that the Japanese custody law does not violate fundamental principles of human rights[?]

i. Whether the trial court erred by finding that the Japanese custody law does not violate due process[?]

Father's Brief at 2.[5]

In reviewing Father's issues on appeal, we apply the following standard:

[W]here [t]he issue for review centers on the question of subject matter jurisdiction….this question is purely one of law, our

_____

[5] On June 16, 2017, Father filed a motion to strike Appellee's Brief due to her failure to comply with Pa.R.A.P. 2117(a)(4) (Statement of the Case) and 2119(c) (Argument). Specifically, Father avers that Mother's brief does not include any citations to the reproduced record or the certified record in support of her recitation of the relevant facts in the case. Further, Father avers that this Court should strike Mother's appellee brief because her counsel did not provide his counsel with a hardcopy of the brief in violation of Pa.R.A.P. 2187(a)(3) (providing, "each party shall serve 2 copies of its definitive brief and reproduced record on every other party separately represented"). However, Father asserts that he received an electronic copy of Mother's brief on the date she filed it in this Court's PACfile system. Upon review, Father does not allege that he suffered any prejudice due to Mother's noncompliance with the foregoing rules, nor are we aware of any. Indeed, the parties are well acquainted with the facts of this case, and Mother served Father with her appellee brief. Accordingly, we deny Father's motion.

standard of review is *de novo*, and our scope of review is plenary.

**B.J.D. v. D.L.C.**, 19 A.3d 1081, 1082 (Pa. Super. 2011) (quotations and citations omitted).[6]

Initially, the UCCJEA applies to child custody determinations issued in foreign countries, as follows:

**§ 5405. International application of chapter.**

**(a) *Foreign country treated as state.* —** A court of this Commonwealth shall treat a foreign country as if it were a state of the United States for the purpose of applying Subchapter B (relating to jurisdiction) and this subchapter.

**(b) *Foreign custody determinations.* —** Except as otherwise provided in subsection (c), a child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of this chapter must be recognized and enforced under Subchapter C (relating to enforcement).

---

[6] In **S.K.C. v. J.L.C.**, 94 A.3d 402 (Pa. Super. 2014), this Court differentiated between an appeal from an order to exercise or decline jurisdiction, which would be subject to an abuse of discretion standard. We explained:

This language is accurate in that, when a trial court possesses subject matter jurisdiction over a child custody dispute, a trial court's decision to exercise that jurisdiction is subject to an abuse of discretion standard of review. However, we have imprecisely quoted this language even when the question was not whether the trial court properly exercised (or declined to exercise) jurisdiction, but rather the question was whether the trial court actually possessed subject matter jurisdiction.

**Id.** at 406-407.

**(c)** *Violation of human rights.* — A court of this Commonwealth need not apply this chapter if the child custody law of a foreign country violates fundamental principles of human rights.

23 Pa.C.S. § 5405.

Pennsylvania has jurisdiction to make an initial child custody determination as follows, in relevant part:

**§ 5421. Initial child custody jurisdiction.**

**(a)** *General rule.* — Except as otherwise provided in section 5424 (relating to temporary emergency jurisdiction), a court of this Commonwealth has jurisdiction to make an initial child custody determination only if:

**(1)** this Commonwealth is the home state of the child on the date of the commencement of the proceeding or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this Commonwealth but a parent or person acting as a parent continues to live in this Commonwealth;

**(2)** a court of another state does not have jurisdiction under paragraph (1) or a court of the home state of the child has declined to exercise jurisdiction on the ground that this Commonwealth is the more appropriate forum under section 5427 (relating to inconvenient forum) or 5428 (relating to jurisdiction declined by reason of conduct) and:

**(i)** the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this Commonwealth other than mere physical presence; and

**(ii)** substantial evidence is available in this Commonwealth concerning the child's care, protection, training and personal relationships;

**(3)** all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this Commonwealth is the more appropriate forum to

determine the custody of the child under section 5427 or 5428; or

**(4)** no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2) or (3).

**(b)** *Exclusive jurisdictional basis.* — Subsection (a) is the exclusive jurisdictional basis for making a child custody determination by a court of this Commonwealth.

. . .

23 Pa.C.S. § 5421(a), (b).

We also observe Section 5425 (Notice; opportunity to be heard; joinder) which provides, in part, that the UCCJEA "does not govern the enforceability of a child custody determination made without notice or any opportunity to be heard." 23 Pa.C.S. § 5425(b).

Finally, Section 5424 (Temporary emergency jurisdiction) provides in relevant part:

A court of this Commonwealth has temporary emergency jurisdiction if the child is present in this Commonwealth and the child has been abandoned or it is necessary in an emergency to protect the child because the child or a sibling or parent of the child is subjected to or threatened with mistreatment or abuse.

23 Pa.C.S. § 5424(a).

Father first argues, with respect to issue "h," that the trial court erred in failing to find that Japan's child custody laws violate fundamental human rights. Father also argues, with respect to issue "i," that the trial court erred in failing to find that the Japanese courts violated his guarantee of due process. Therefore, Father argues that the trial court erred by enforcing the

Japanese custody order pursuant to Section 5405(c) (International application of chapter) and 5425(b) (Notice; opportunity to be heard; joinder). Next, regarding issue "a," Father argues that the trial court erred in concluding that it did not have emergency jurisdiction under Section 5424 (Temporary emergency jurisdiction); namely, to protect L.N.D. from alleged sexual abuse by Mother. Father argues that it follows, with respect to issues "e" and "f," the trial court erred by prohibiting him from presenting witnesses and documentary evidence with respect to Mother's alleged sexual abuse of L.N.D. With respect to issues "b" and "g," Father argues that the trial court erred in finding that it did not have subject matter jurisdiction under Section 5421 (Initial child custody jurisdiction). Regarding issue "c," Father argues that the trial court erred by vacating the protection from abuse orders entered against Mother. Finally, regarding issue "d," Father argues that the trial court erred in failing to find that Mother waived her argument that the trial court did not have subject matter jurisdiction.

We have reviewed the subject March 2, 2017 custody order in light of the parties' briefs, the certified record, the trial court's Rule 1925(a) opinion, and the relevant UCCJEA provisions. It is important to note the trial court's credibility determinations against Father as follows, which the record evidence supports.

> [M]ultiple pleadings from Father omit[ed] material information and, at times, contain[ed] outright falsehoods. Father, the [trial] [c]ourt believes, sought to dupe [the] [c]ourt throughout this process. Father argued facts in [the] [trial] [c]ourt which

- 12 -

were completely contrary to concessions he freely made in the Japanese Court, *i.e.*, that his travels to [Allegheny County] were for vacation, that Father wanted Japan to be the "home base" of [L.N.D.], and that [L.N.D.] lived in Japan.

Trial Court Opinion, 4/11/17, at 22.

The trial court concluded that it never had initial child custody jurisdiction under Section 5421, *supra*. We agree. The trial court aptly explained:

[L.N.D.] lived in Japan. Mother lived in Japan. **Father** lived in Japan. Travel to [Allegheny County] was temporary, and [L.N.D.] and Father always intended to return to Japan, until Father -- under false pretenses; after having lost custody litigation in Japan; and after Japan determined, following an investigation, that Mother did not sexually abuse [L.N.D.] -- took custody of [L.N.D.] in Canada last year. Japan was and always has been [L.N.D.]'s home state; jurisdiction was and has always been appropriate there. No litigable threat or danger to [L.N.D.] from Mother in Japan exists for the [trial] [c]ourt to legitimately conclude otherwise.

*Id.* at 23 (emphasis in original; footnote omitted).

Likewise, we agree that the trial court properly refused to exercise temporary emergency jurisdiction under Section 5424, *supra*. The trial court explained that Father argued it should invoke emergency jurisdiction to protect L.N.D. "from threatened sexual abuse. . . . See Father's Supplemental Trial Memo at 9-10." *Id.* at 21. The trial court reasoned:

[A]llegations of sexual abuse by Mother against [L.N.D.] were investigated in Japan. [L.N.D.], his brother, Mother, her current husband, among others, were interviewed. Ultimately, Mother was awarded parental authority and custody of [L.N.D.] in Japan, it was determined that Mother did not sexually abuse [L.N.D.], and no criminal charges were filed by the Japanese authorities.

- 13 -

. . . [The trial] [c]ourt, accordingly, declined (i) to assert emergency jurisdiction pursuant to previously litigated and baseless claims and (ii) to permit Father another "bite at the apple" by re-litigating said claims here. . . .

*Id.*

Upon careful review, we conclude that the thorough opinion by the Honorable Susan Evashavik DiLucente, filed on April 11, 2017, pursuant to Pa.R.A.P. 1925(a), addresses all of the issues raised by Father and supports the reasons for the trial court's decision to grant Mother's request to enforce the Japanese custody order and vacate the trial court's previous orders awarding Father custody of L.N.D. We conclude that the trial court did not commit an error of law. Accordingly, we adopt the trial court's April 11, 2017 opinion as our own.[7]

_____

[7] On August 14, 2017, Father filed a motion to supplement wherein he requested permission to supplement the certified record before this Court with an "affidavit of translation," which he attached to the motion as Exhibit A. The affidavit translates Mother's July 31, 2017 response to Father's petition filed against her in the Kobe Family Court, Japan, to change the person with "parental authority" over L.N.D. In said response, Mother requested that Father's petition be dismissed on the basis that she no longer had "parental authority" over L.N.D. Rather, Mother avers that L.N.D.'s maternal grandfather has "parental authority" over him. Mother averred that the maternal grandfather gained "parental authority" by legally adopting L.N.D. in Japan on July 7, 2017.

On August 25, 2017, Mother filed an answer to the motion to supplement, and Father filed a reply on August 30, 2017. In her answer, Mother avers that Father "attempts to supplement the certified record without providing Mother the ability to confront Father's factual allegations. . . ." Answer, 8/25/17, at 4. Moreover, Mother avers that Father does not provide an

*(Footnote Continued Next Page)*

Order affirmed. Motion to strike Appellee's brief denied. Motion to supplement denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/16/2017

applicable Pennsylvania appellate rule or case law that supports his request that this Court open the certified record to consider new evidence. We agree. Accordingly, we deny Father's motion to supplement.

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

JOSEPH DECHICCHIS,

               Plaintiff,

      v.

NANAKO TAKI,

               Defendant.

No.: FD 06-009214-002

Superior Court # 353 WDA 2017

**CHILDREN'S FAST TRACK**

**OPINION**

BY:

Honorable Susan Evashavik DiLucente
704 City County Building
414 Grant Street
Pittsburgh, PA 15219

COPIES TO:

Counsel for Plaintiff:

Christine Gale, Esquire
707 Grant Street
Suite 3300
Pittsburgh, PA 15219

Counsel for Defendant:

Robert Raver, Esquire
Andrew P. Griffin, Esquire
437 Grant Street
Suite 501
Pittsburgh, PA 15219



IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

JOSEPH DECHICCHIS,

                Plaintiff,

    v.

NANAKO TAKI,

                Defendant.

No.: FD 06-009214-002

Superior Court # 353 WDA 2017

## I. Background[1]

Plaintiff Joseph DeChicchis ("Father") was born and raised in Allegheny County, Pennsylvania ("AC"). Defendant Nanako Terada, f/k/a Nanako Taki ("Mother") was born in Japan and is a citizen thereof. The parties wed in 1994, and have two children, who were born in Japan, where Father has been employed as a university professor for more than two decades, though he – at times – performs his employment duties in other locations, including AC. Only one of the parties' children is the subject of the instant litigation ("Child"), as the other is now an adult.

After the Child's birth in 2001, he lived in Japan with Mother, Father, and his sibling, though he often traveled with, among others, Father to AC to visit his paternal relatives for vacations, holidays, and special occasions.

---

[1] The facts set forth in Section I are those the Court found to be credible at the hearing in this case, as well as those evident from the contents of the dockets before this Court and the Pennsylvania Superior Court at 20 WDM 2017.

Over time, the parties' marriage deteriorated, and they ultimately divorced in Japan in 2005. In connection with the divorce, the parties executed a legally binding document in Japan on February 25, 2005, which provided, among other things, that (i) they shared physical custody of Child and (ii) Mother had parental authority over him. No divorce proceedings were initiated in AC, and neither party took action to obtain a custody order in AC. Instead, they shared custody of the child, pursuant to their Japanese agreement, in Japan, where they all lived and where Father, in fact, owned real property.

This situation changed the following year. On November 3, 2006, Father presented a Petition to Confirm Custody to this Court. Therein, he alleged, among other things:

- that the parties shared physical custody of Child, and Mother possessed parental authority of him pursuant to the parties' Japanese Notarial Contract, see ¶ 7 & 10;

- Child was "in the care and custody of . . . [F]ather in [AC] from August 6, 2004, through February 6, 2005[,]" see ¶ 11;

- Child was in the equal shared custody of both parties in Japan from February 7, 2005 through July 21, 2005, see id.;

- Child was in Father's custody in AC from July 21, 2005 through August 30, 2005, see id.;

2

- Child was in the equal shared custody of both parties in Japan from August 31, 2005 through March 6, 2006, see id.;

- Child was in Father's custody in AC from March 6, 2006 through April 6, 2006, id.;

- Child was in the equal shared custody of both parties in Japan from April 7, 2006 through July 25, 2006, id.;

- Child was in Father's custody in AC from July 25, 2006 through November 3, 2006, i.e., the filing date of the Petition to Confirm Custody, id.; and

- "Pennsylvania is an appropriate jurisdiction regarding custody of the [Child] as the [Child] ha[s] lived throughout [his] li[fe] in Pennsylvania, and the [Child] w[as] in Japan for a period of greater than six months only during [the Child's] first year of life in 2001-2002[,]" see ¶ 19.

Mother did not appear to contest the Petition to Confirm Custody, and this Court – through a different jurist – granted the petition based upon Father's averments, which were not verified by Father. Those averments failed to establish Child had lived in AC for six continual months prior to the petition's filing, and – it is now clear[2] – misrepresented that Child had "lived throughout [his] li[fe] in Pennsylvania." That said, Father received an order dated November 3, 2006 awarding him primary legal and physical custody of Child.

---

[2] See note 1, supra.

Father subsequently returned with Child to Japan, where he, Mother and Child lived. Father never sought to enforce the November 3, 2006 AC custody order – or any subsequent such AC order – in that country, which, though not a member of the Hague Convention until 2014, nevertheless had a legal mechanism to enforce foreign custody orders. Instead, in January 2007, the parties participated in a Japanese custody mediation. At the conclusion thereof, they agreed that Father would have parental authority of the Child, but that physical custody would continue to be shared.

More than two years later, while the Child continued to live in Japan with Mother and Father, but traveled to AC with Father from time to time,[3] the latter moved this Court to correct a typographical error on its 2006 custody order. Mother again did not appear to participate. Notably, Father's motion to correct said error was not personally verified by Father. It also failed to mention anything about the January 2007 mediation proceedings in Japan, which resulted in a shared physical custody agreement, or the then-current residences of the parties or Child. Based upon Father's allegations concerning a mere typographical error, another custody order dated March 30, 2009 was entered in AC, granting Father primary legal and physical custody of Child. Notably, Father was provided with a custody order (i) dated after the parties' 2007

---

[3] See note 1, supra.

4

Japanese custody mediation agreement and (ii) obtained, as noted above, (a) in Mother's absence and (b) without apprising this Court of all material facts.

On September 26, 2012, Mother initiated legal proceedings in Japan, seeking parental authority and custody of the Child. Father subsequently filed his own petitions in Japan, requesting, *inter alia*, enforcement of his parental authority – obtained during the parties' 2007 Japanese Mediation – and full custody, through the Japanese legal system; he did not petition that Court to enforce either this Court's November 2006 or March 2009 orders.[4] The parties' Japanese petitions were consolidated in the Japanese court, several unsuccessful mediations were held, and the litigation continued.

As the custody action in Japan moved forward, Father presented a Petition for Contempt in this Court on May 24, 2013. Therein, he alleged that the parties and Child presently resided in Japan, that he and the Child had plans to return to "their home" in AC in May or June 2013;[5] and that Mother had refused to return Child to Father at the conclusion of her visitation time on April 19, 2013. Father averred that the Japanese police provided him with no assistance, and that he was seeking recourse through the Japanese legal system. He contended that Mother's conduct revealed that she was in violation of this

_____

[4] Notably, Father's Japanese filings conceded various issues material to the instant dispute, including that his and Child's trips to AC were vacations and that he wanted Japan to be the Child's "home base[.]"

[5] See note 4, supra.

5

Court's March 30, 2009 custody order; that she should, therefore, be held in contempt; and that the March 30, 2009 custody order should be amended to reflect that Father had sole primary legal and physical custody. While Father personally verified his May 2013 Petition for Contempt, he did not aver within it anything about the parties' 2007 Japanese mediation and agreement regarding shared physical custody, Mother's initiation of Japanese legal proceedings in 2012, Father's own and subsequent initiation of Japanese legal proceedings, that the parties had undergone multiple Japanese custody mediations, or that the Japanese legal proceedings were ongoing. Based upon Father's allegations, the Court entered an order awarding Father various types of relief, including his requested amendment to the March 30, 2009 custody order, i.e., he obtained an AC order stating that he had sole primary legal and physical custody while he nevertheless continued to litigate the same issue in Japan.

Father also presented a Petition to Clarify Custody to this Court on June 19, 2013. Therein, he sought a clarified order stating that he had sole legal and physical custody of Child. Said order was entered based upon Father's allegations, which he did not personally verify, which did not contain any information about the then-ongoing custody proceedings in Japan, and which falsely represented that Father and Child "were residing temporarily in Japan as

6

a result of . . . [F]ather's employment responsibilities"[6] and that the Child had "always been in the primary and sole physical custody of the [F]ather until such time as the [M]other abducted the [C]hild." Rather than inform this Court that he was seeking custody of Child in Japan, Father only represented that he was attempting to secure the Child's return through the Japanese legal system.

On July 5, 2013, Father presented another contempt petition to this Court, contending that Mother continued to violate this Court's custody orders and the May 24, 2013 order entered after Father's initial contempt petition. Based upon Father's allegations, Mother was held to be in contempt and the Child was ordered to be returned to Father immediately. Such a ruling was made without any averment from Father that custody proceedings, in which he was an active participant, were ongoing in Japan.

As the parties' custody matters continued to progress in Japan, Father filed a protection from abuse ("PFA") petition against Mother in AC in December 2013. Therein, Father alleged that Mother was sexually assaulting the Child. Father also (i) falsely averred that he lived in AC and (ii) had sole and primary physical and legal custody of the Child. His PFA petition made no reference to any Japanese custodial proceedings (ongoing or otherwise),

---

[6] See note 4, supra.

mentioned only the custody proceedings Father initiated in AC, and omitted residency information for the Child, who actually lived in Japan.[7]

In a subsequent brief in support of jurisdiction for Father's PFA petition, he set forth the following as background information:

> Father and Mother are the natural parents of [Child]. Pursuant to an order of this Court dated November 2, 2006, Father was named the primary physical and legal custodian of Child . . . . Mother had moved to Japan in 2005, at which time she held a permanent US resident visa. Father has continued to reside with the [Child] in [AC]. Since 2006, Father and the [Child] have traveled to Japan regularly for Father's work. When in Japan, the [Child] ha[s] regularly spent time with Mother.

See January 8, 2014, Brief at 2. Notably absent from Father's recitation is any information about prior or ongoing Japanese custody proceedings, some of which Father initiated. He also presented the matter as if (i) Mother had "moved to Japan in 2005[,]" which indicates that prior thereto she lived in the United States, a falsity, and (ii) the Child "reside[d] . . . in [AC,]" another falsity since the Child and Father lived in Japan and only traveled to AC for holidays, vacations, and other special occasions.[8]

Ultimately, Father obtained a final PFA order against Mother on January 9, 2014, again stating that he had custody of Child. The PFA order also excluded

---

[7] See note 4, supra.

[8] See notes 1 & 4, supra.

Mother from Father's purported AC residence, though Mother lived in Japan and did not reside in AC. It also prohibited Mother from visiting "THE CHILD'S SCHOOL IN PENNSYLVANIA." Notably, Child did not attend school in Pennsylvania.

Father subsequently moved this Court to find Mother in contempt for failure to surrender Child to him pursuant to the PFA order. The Court – informed only by the information provided by Father, which contained nothing about prior or ongoing Japanese custody proceedings – held Mother in contempt by order dated September 9, 2014. Pursuant to the Court's contempt order, a warrant to arrest Mother was issued, and Japanese authorities were ordered to extradite Child from Japan to AC.

Mother and Child, however, remained in Japan, where custody proceedings – initiated by both parties – continued. Investigations into Mother's alleged sexual abuse of Child were also ongoing in Japan.

On March 20, 2015, the Japanese court entered an order awarding Mother parental authority and physical custody of Child. Father appealed that order in Japan. He also continued (i) to present motions to this Court seeking relief and (ii) to do so without mentioning the Japanese legal proceedings or that Mother had actually been awarded parental authority and physical custody of Child in Japan. See August 21, 2015 Emergency Motion to Reinstate

9

Bench Warrant against Mother. This Court – still only exposed to Father's incomplete and inaccurate statement of the facts – even entered an order in August 2014, i.e., months after Mother had been awarded parental authority and custody of the Child in Japan in proceedings initiated by both parties and in which both parties participated, commanding again that Mother be arrested and Child extradited to AC as a result of, among other things, Father's continued assertion that he had custody of Child pursuant to the November 2006 AC order and utter silence about the goings on in Japan.

By December 16, 2015, Father's appeals of the March 20, 2015 Japanese custody order had been denied. Mother had thus obtained a final order in Japan awarding her parental authority and custody of Child. Moreover, the Japanese proceedings determined – after investigation – that Mother did not sexually abuse Child, as Father alleged in his PFA petition before this Court.

Father nevertheless continued to seek custody of the Child through this Court. Indeed, in July 2016, Father presented an emergency ex parte motion, alleging that he had received custody of Child from this Court in November 2006. He further averred that Mother had been sexually abusing child, absconded with him in Japan in 2013, and had thereafter refused to return him to Father, despite Father's subsequent filings in this Court. Father also contended that he learned that Child would be traveling with Mother in Canada on August 2, 2016; and he thus sought an order directing the Canadian

10

authorities to, among other things, transfer Child from Mother to Father. Based on Father's allegations, such an order was entered. Notably, Father never informed the Court that Mother had obtained a final order in Japan (i) granting her parental authority and physical custody of Child and (ii) finding that she had not sexually abused the Child.

Father ultimately took control of the Child in Canada in August 2016. Child was subsequently taken to Pennsylvania, and Mother, in an attempt to have him returned to her, filed a petition (the "Petition") the following month (i) to enforce her foreign custody order, (ii) to vacate this Court's previous custody orders, and (iii) to obtain sanctions. Father filed an answer to said Petition.

This Court held an extensive hearing – over multiple days – during which, among others, the parties, the parties' children, and members of Father's family testified. The parties' Japanese attorneys also testified to provide needed context of the parties' Japanese legal proceedings and the state of Japanese family law. The purpose of said hearing was to address the parties' respective arguments on Mother's Petition. Mother contended that she was entitled to enforcement of the 2015 final Japanese custody order pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), specifically 23 Pa. C.S. §§ 5405, 5448, and 5433. Mother furthered argued that the custody orders entered in this Court should be afforded no weight or merit as (i) this Court did not have jurisdiction to enter them under the UCCJEA, see 23 Pa. C.S. § 5421; (ii)

11

even if this Court had jurisdiction to enter them, it no longer has such jurisdiction, see 23 Pa. C.S. § 5424; and (iii) should the foregoing two positions lack merit, jurisdiction should be denied pursuant to 23 Pa. C.S. § 5427.

Father argued, among other things, that (i) this Court had jurisdiction to initially enter the November 2006 custody order; (ii) this Court has never lost jurisdiction; (iii) the Japanese courts, accordingly, never had jurisdiction to enter the custody order made final in 2015 since jurisdiction has always resided in this Court; (iv) the Japanese legal process and system denied Father and will continue to deny Father important legal and human rights, including the right to cross-examine Mother and to have joint custody of the Child; and that (v) this Court may invoke emergency jurisdiction under the UCCJEA, should the foregoing arguments lack merit.

On March 2, 2016, this Court entered an order stating (the "Order"), among other things:

> 1) Mother's [petition to enforce foreign custody order] is granted in the following respects: the Japanese custody order made final on December 16, 2015 shall be enforced, and this Court's orders awarding custody of Child to Father are hereby vacated due to lack of initial jurisdiction, continuing jurisdiction, or emergency jurisdiction.
>
> 2) The Japanese legal proceedings did not deprive Father of notice or the opportunity to be heard.
>
> 3) The Japanese child custody laws do not violate fundamental principles of human rights. . . .

12

Following the issuance of the Order, Father – through counsel – orally requested that the Court stay the order pending his appeal to the Pennsylvania Superior Court. Said request was denied by separate order dated March 2, 2016, which states:

> Pursuant to 23 Pa. C.S. § 5454 ("Section 5454"), Father may appeal the Order and do so "in accordance with expedited appellate procedures." See 23 Pa. C.S. § 5454. Section 5454 also prohibits this Court from staying the Order absent circumstances not applicable here. Id. While Section 5454 "leaves intact the possibility of [Father] obtaining an extraordinary remedy such as mandamus or prohibition from an appellate court to stay th[is C]ourt's enforcement action[,]" this Court is constrained to deny the [oral request for stay]. Id. at Comment.

Father then filed a Notice of Appeal to the Superior Court and a Pa.R.A.P. 1925(b) Statement. He also filed a Petition for Supersedeas in the Superior Court, which was docketed at 20 WDM 2017. In said petition, Father falsely represented, among other things, that he had presented this Court with a written motion to stay its Order and that this Court refused to enter a stay by taking no action on the written motion. See Exhibit A (containing the relevant parts of Father's Petition for Supersedeas at 20 WDM 2017, which Father served on this Court). No written motion for a stay of the Order was ever presented to this Court, and as noted above, the Court indeed addressed Father's request for

13

a stay, made orally, on March 2, 2017, by written order, information which Father withheld from the Superior Court.

## II. Father's Claims

Father's Pa.R.A.P. 1925(b) Statement sets forth the following claims:

    a. The trial court erred by finding that there was not Emergency Jurisdiction under the UCCJEA;

    b. The trial court erred by finding that it did not have subject matter jurisdiction and/or finding that subject matter jurisdiction was lost;

    c. The trial court erred by vacating any protection from abuse orders;

    d. The trial court erred in failing to find that mother waived her challenge to subject matter jurisdiction;

    e. The trial court erred by denying the father the right to call witnesses, such as Dr. Bruce Chambers and Annette Tierney as applied to emergency jurisdiction;

    f. The trial court erred by failing to admit certain evidence and testimony of the child's abuse;

    g. The trial court erred by not finding that the Japanese court lacked subject matter jurisdiction.

    h. The trial court erred by finding that the Japanese custody law does not violate fundamental principles of human rights;

    i. The trial court erred by finding that Japanese custody law does not violate due process.

14

The foregoing fall into four distinct categories: jurisdiction, Japan and fundamental rights, the PFA orders, and evidence claims. Each category is discussed below.

## III. Jurisdiction Claims

In claims a, b, d, and g Father presents claims sounding in jurisdiction. Individually and collectively they lack merit. *First,* the law clearly provides:

> The court may raise at any time a question of (1) jurisdiction over the subject matter of the action or (2) the exercise of jurisdiction pursuant to § 5426 of the [UCCJEA], relating to simultaneous proceedings in other courts, § 5427, relating to inconvenient forum, and § 5428 relating to jurisdiction declined by reason of conduct.

See Pa.R.Civ.P. 1915.5(a) *note.* Accordingly, claim "d," relating to Mother's purported waiver of any challenge to subject matter jurisdiction must fail. This Court may raise the issue at any time and did so. Id. Moreover, Mother cannot waive such a challenge. See In re Casale, 517 A.2d 1260, 1261-62 (Pa. 1986) ("An objection to lack of subject matter jurisdiction can never be waived; it may be raised at any stage of the proceedings by the parties or by a court on its own motion." (citation omitted)); see also In re Estate of Albright, 545 A.2d 896, 902

15

(Pa. Super. Ct. 1988) ("while one may never waive subject matter jurisdiction; personal jurisdiction is readily waivable").[9]

**Second**, this Court, having correctly concluded that it may address subject matter jurisdiction, properly found that it lacked initial subject matter jurisdiction to enter the November 2006 custody order. A court of this Commonwealth possesses jurisdiction to enter an initial custody determination only where:

> (1) this Commonwealth is the home state of the child
> on the date of the commencement of the proceeding

---

[9] Father also previously argued to this Court that Mother should be estopped from contending that the Court lacked jurisdiction to enter his various custody orders. However, his Pa.R.A.P. 1925(b) Statement only advances an argument that Mother waived her challenge to this Court's purported lack of jurisdiction. Accordingly, Father has waived any estoppel based argument. See Pa.R.A.P. 1925(b)(4)(vii). Regardless, Father's estoppel argument lacked merit. Indeed, the Court does not believe that Mother's request for visitation with Child, while she was present in Pennsylvania for the proceedings to enforce her foreign custody order, estops her from contending the Court lacked subject matter jurisdiction, as Father alleges. See Father's Supplemental Trial Memo at 10-12. The case Father cites for such a proposition does not so hold, see Reese v. Reese, 506 A.2d 471, 474-75 (Pa. Super. Ct. 1986) (holding "that one who requests pre-divorce equitable distribution, who receives the relief he has requested, and who acts to receive the benefits of an order distributing marital property is thereafter estopped from denying the jurisdiction of the court to enter the order prior to divorce"); and 23 Pa. C.S. § 5444 (pertaining to temporary visitation) does not state that it is the exclusive mechanism by which a party must obtain temporary visitation, see id. ("A court of this Commonwealth which does not have jurisdiction to modify a child custody determination **may** issue a temporary order enforcing . . . " (emphasis added)). Mother's attempt to visit with Child as her Petition was adjudicated was proper and understandable under the circumstances, i.e., among other things, she had not seen Child for months due to Father's duplicitous conduct before this Court resulting in custodial and PFA orders lacking in jurisdiction and procured by fraud.

16

or was the home state of the child within six months before the commencement of the proceeding and the child is absent from the Commonwealth but a parent or person acting as a parent continues to live in this Commonwealth;

(2) a court of another state does not have jurisdiction under paragraph (1) or a court of the home state of the child has declined to exercise jurisdiction on the ground that this Commonwealth is the more appropriate forum under section 5427 (relating to inconvenient forum) or 5428 (relating to jurisdiction declined by reason of conduct) and:

> (i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this Commonwealth other than mere physical presence; and

> (ii) substantial evidence is available in this Commonwealth concerning the child's care, protection, training and personal relationships;

(3) all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this Commonwealth is the more appropriate forum to determine the custody of the child under section 5427 or 5428; or

(4) no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2) or (3).

23 Pa. C.S. § 5421(a). "Home state" is defined – for jurisdictional purposes – as: "[t]he state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before commencement of a child custody proceeding. . . . A period of temporary absence of any of the mentioned persons is part of the period." 23 Pa. C.S. §5402. A foreign country,

17

like Japan, is treated as a state for purposes of determining the propriety of jurisdiction. 23 Pa. C.S. § 5405(a).

Here, as set forth above, Child was born in Japan and lived there with Mother and Father, despite Father's protestations to the contrary,[10] up to and including November 2006, the time when Father filed his initial Petition to Confirm Custody. Child only visited AC on a temporary basis for holidays, vacations, and other special occasions. Pennsylvania was thus not the state in which Child lived at the time Father initiated this case. Indeed, the Petition to Confirm Custody itself did not aver facts sufficient to find that Child lived in AC with either parent for six continual months prior to November 2006, or within six months of that date. Accordingly, 23 Pa. C.S. § 5421(a)(1) did not provide this Court with subject matter jurisdiction.

The other subsections of 23 Pa. C.S. § 5421(a) also fail to demonstrate that subject matter jurisdiction lay in this Court in November 2006. A court of another state (here a country) had jurisdiction, i.e., Japan, because Child lived there continuously with Mother and Father since birth excluding some temporary (and thus immaterial) trips to other locales, including AC; and no court had ever declined to exercise custodial jurisdiction on any basis, precluding application of 23 Pa. C.S. §§ 5421(a)(2), (3), and (4).

---

[10] The Court notes, among other things, that Father himself owned two residences in Japan, but none in Pennsylvania; that members of his own family believed he lived in Japan, and only visited AC; and that, indeed, Father had recently instructed members of his family to assert that he lived in AC, not Japan, as such issue became material to this case. See also note 4, supra.

Subject matter jurisdiction was, therefore, lacking here in November 2006. Thus, claim "b" in Father's Pa.R.A.P. 1925(b) Statement fails.

**Third**, the foregoing analysis reveals that the Court properly determined that the Japanese courts would have had jurisdiction to enter a custody order in November 2006 and did have such jurisdiction in 2015 when the order granting custody to Mother was entered and finalized in Japan. Simply put, Japan was the Child's home state. See 23 Pa. C.S. § 5421(a)(4). Claim of error "g" is devoid of merit.

**Fourth**, the Court lacked emergency jurisdiction. Regarding emergency jurisdiction, Pennsylvania law provides:

> (a) General rule.--A court of this Commonwealth has temporary emergency jurisdiction if the child is present in this Commonwealth and the child has been abandoned or it is necessary in an emergency to protect the child because the child or a sibling or parent of the child is subjected to or threatened with mistreatment or abuse.
>
> (b) No previous custody determination or proceeding.-- If there is no previous child custody determination that is entitled to be enforced under this chapter and a child custody proceeding has not been commenced in a court of a state having jurisdiction under sections 5421 (relating to initial child custody jurisdiction) through 5423 (relating to jurisdiction to modify determination), a child custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under sections 5421 through 5423. If a child custody proceeding has not been or is not commenced in a court of a state having jurisdiction under sections 5421 through 5423, a child custody determination made under this section becomes a final determination if it so

19

provides and this Commonwealth becomes the home state of the child.

(c) Previous custody determination or proceeding.--If there is a previous child custody determination that is entitled to be enforced under this chapter or a child custody proceeding has been commenced in a court of a state having jurisdiction under sections 5421 through 5423, any order issued by a court of this Commonwealth under this section must specify in the order a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under sections 5421 through 5423. The order issued in this Commonwealth remains in effect until an order is obtained from the other state within the period specified or the period expires.

(d) Mandatory communication between courts.--A court of this Commonwealth which has been asked to make a child custody determination under this section, upon being informed that a child custody proceeding has been commenced in or a child custody determination has been made by a court of a state having jurisdiction under sections 5421 through 5423, shall immediately communicate with the other court. A court of this Commonwealth which is exercising jurisdiction pursuant to sections 5421 through 5423, upon being informed that a child custody proceeding has been commenced in or a child custody determination has been made by a court of another state under a statute similar to this section, shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child and determine a period for the duration of the temporary order.

23 Pa. C.S. § 5424.

Here, Father argued that this Court could – even if it determined it lacked initial jurisdiction – invoke emergency jurisdiction pursuant to the foregoing

20

because the Child "is present in this Commonwealth and it is necessary for this Court to protect the [C]hild from threatened sexual abuse that this Court previously found in protection from abuse proceedings." See Father's Supplemental Trial Memo at 9-10. The Court disagrees. Indeed, allegations of sexual abuse by Mother against Child were investigated in Japan. Child, his brother, Mother, her current husband, among others, were interviewed. Ultimately, Mother was awarded parental authority and custody of Child in Japan, it was determined that Mother did not sexually abuse Child, and no criminal charges were filed by the Japanese authorities.

Under such circumstances, this Court did not believe it was appropriate to invoke emergency jurisdiction pursuant to 23 Pa. C.S. § 5424. Simply put, issues of purported sexual abuse were litigated in Japan and found to be meritless. This Court, accordingly, declined (i) to assert emergency jurisdiction pursuant to previously litigated and baseless claims and (ii) to permit Father another "bite at the apple" by re-litigating said claims here. The Court's previous entry of orders in this matter pursuant to the PFA Act do not, for the reasons set forth below in Section V, alter those conclusions. Father's claim of error "a" fails.

In conclusion, the Court believes that each of Father's jurisdictional claims lack merit. They are, indeed, essentially premised upon Father's contention that he and Child lived in Pennsylvania, not Japan, and that this Court, as a result, had jurisdiction to award Father custody in November 2006. That premise is not

21

supported by credible evidence. The Court heard and weighed the witnesses' testimony, and believes both Child and Father lived in Japan and instead only visited Pennsylvania, even if some visits were extended. Father's testimony to the contrary was utterly unbelievable,[11] and even a quick perusal of the hearing transcripts reveals his duplicity. He simply would not answer even the most basic of questions – including those posed by his own counsel, who at one point sought permission to treat Father as a hostile witness – in a forthright and straightforward manner. Among many examples, consider the manner in which he responded to questions about whether or not he owned residences in Japan.

Indeed, the Court's credibility determination concerning Father – made after hearing all of the evidence – is supported by a review of the docket, which contains, as set forth above, multiple pleadings from Father omitting material information and, at times, containing outright falsehoods. Father, the Court believes, sought to dupe this Court throughout this process. Father argued facts in this Court which were completely contrary to concessions he freely made in the Japanese Court, i.e. that his travels to AC were for vacation, that Father wanted Japan to be the "home base" of the Child, and that the Child lived in Japan. The Court also feels compelled to note that it appears that Father has already sought to dupe the Superior Court with his Request for Supersedeas at

---

[11] See note 4, supra.

22

20 WDM 2017, which contains false allegations and omissions regarding Father's request that this Court stay its Order.

Child lived in Japan. Mother lived in Japan. **Father** lived in Japan.[12] Travel to AC was temporary, and Child and Father always intended to return to Japan, until Father – under false pretenses; after having lost custody litigation in Japan; and after Japan determined, following an investigation, that Mother did not sexually abuse Child – took custody of Child in Canada last year. Japan was and has always been Child's home state; jurisdiction was and has always been appropriate there. No litigable threat or danger to Child from Mother in Japan exists for the Court to legitimately conclude otherwise.

## IV. Japan and Fundamental Rights

Father's contends – in claims of error "h" and "i" – that this Court should not have enforced Mother's Japanese custody orders because Japanese custody law, he submits, violates fundamental rights. Two types of rights are implicated: first, Father's right to due process; and second, fundamental human rights. Father's arguments fail.

### A. Fundamental Human Rights

Chapter 54 of Title 23 provides that "[a] court of this Commonwealth need not apply this chapter if the child custody law of a foreign country violates

---

[12] See notes 4 & 10, supra, among other things.

23

fundamental principles of human rights." 23 Pa. C.S. § 5405(c). Father contends that Japanese custody law violates fundamental human rights in the following ways:

- Mother's Japanese custody order "makes no award of any physical custody time or visitation for Father[,]" see Father's Supplemental Trial Memo at 5;

- "there are no express provisions for visitation in Japanese custody law and no enforcement mechanism for enforcement of a Japanese visitation schedule should a Japanese Court award visitation[,]" id.; and

- "the Japanese legal system failed to protect the child from sexual abuse[,]" id. at 8.

Father's argument again represents an attempt to deceive the Court. *First*, the credible evidence elicited at the hearing provides an excellent reason why Mother's Japanese custody order failed to award Father "any physical custody time or visitation" with Child: Father never sought it. See February 7, 2017, Hearing Transcript at 561-62. *Second*, Father could seek such visitation under Japanese law, and through such a request obtain – provided it was in Child's best interest –custody time, phone calls, and overnights with Child. See id. at 552-55 & 557-61; see also February 9, 2017, Hearing Transcript at 7-8 & 11-12. *Third*, Japanese custody law provides a mechanism to enforce visitation orders. See id. at 565-66; see also February 9, 2017, Hearing Transcript at 24-25. *Finally*, the Japanese legal system did not fail to protect Child from abuse;

24

rather, it investigated the allegations of sexual abuse and determined that sexual abuse did not occur.

Accordingly, Father's contentions about human rights lack merit. Claim of error "h" must fail.

## B.    Due Process

Relying on 23 Pa.C.S. § 5425, Father argues that "[t]he UCCJEA does not 'govern the enforceability of a child custody determination made without notice or an opportunity to be heard.'" See Father's Supplemental Trial Memo at 4. According to Father, because Mother's attorney noted that the parties' Japanese proceedings "were highly irregular for the Japanese legal system[,]" this Court should somehow find that Japanese custody law violated Father's due process rights. Id. at 5. That position is baseless.

Even if the parties' Japanese proceedings were irregular, the custody determination rendered was not made "without [Father being provided] notice or an opportunity to be heard." 23 Pa. C.S. § 5424(b). Indeed, he initiated custody proceedings in Japan himself, which were ultimately consolidated with Mother's petition. The record also reveals that Father had counsel; he was able to submit evidence, documents, and arguments to the Japanese courts; he was personally able to address the Japanese tribunal, and did so; and Mother was examined during the proceedings. Under such circumstances, the Court does

25

not believe Father can legitimately claim the Japanese courts awarded Mother custody of Child without providing him notice and an opportunity to be heard. Claim "i" fails.

## C.    Conclusion

Based on the forgoing, this Court saw no reason not to enforce Mother's Japanese custody order pursuant to some violation of rights argument. Father actively participated in the process which resulted in the Japanese custody order. He can also obtain visitation rights – and enforce them – in Japan.

## V. The PFA Orders

In claim of error "c", Father argues that this Court erred by vacating any PFA orders. While the relief set forth in the Court's Order does not specifically reference any PFA order as being vacated, the Order, indeed, vacated all "orders awarding custody of Child to Father[,]" and the PFA order provided temporary custody to Father pursuant to its fifth paragraph. That said, no error occurred in regard to any PFA order.

Initially, the Court notes that Father's Pa.R.A.P. 1925(b) Statement does not explain the way in which the Court erred by "vacating any [PFA] orders" and the Court is unclear, from Father's other filings and arguments, of the reason Father believes the Order improperly impacted the PFA order. Our appellate courts have explained that where a Pa.R.A.P. 1925(b) statement "is too vague

26

to allow the court to identify the issues raised on appeal" waiver occurs. Lineberger v. Wyeth, 894 A.2d 141, 148 (Pa. Super. Ct. 2006) (quoting Commonwealth v. Dowling, 778 A.2d 683, 686-87 (Pa. Super. Ct. 2001)) (finding waiver where the Pa.R.A.P. 1925(b) statement merely stated that "the trial court erred when it granted [the appellee's] summary judgment motion" and did not, for example, even bother to reiterate the arguments the appellant had made in opposition to said motion).

Father's vague Pa.R.A.P. 1925(b) Statement requires this Court to "guess" the underlying basis for his claim. Id. (noting waiver occurs where a court must "guess what issues an appellant is appealing" (citation omitted)). Is Father arguing that the Court made some error in evaluating the continued existence of the PFA order? Is he contending the Court lacked the ability to act in connection with the PFA order since more than thirty days had passed since its entry and no appeal from the same occurred or no request for reconsideration was granted? Does Father believe the Court erred in determining whether subject matter or personal jurisdiction to initially enter the PFA existed? The Court does not know the answer to the foregoing or the basis of Father's current claim of error. Waiver of claim "c" can, therefore, be found.

That said, the Court notes the following in regard to the PFA order. **First**, by statute, such an order has a fixed duration not to exceed three years. 23 Pa. C.S. § 6108(d). Here, the PFA order expired on January 9, 2017. While the law

permits extension of a PFA order's term and even though Mother was found in contempt of the PFA order, no extension of the PFA order's duration occurred. Id.; see also 23 Pa. C.S. § 6114(b)(4) ("Upon conviction for indirect criminal contempt and at the request of the plaintiff, the court shall also grant an extension of the protection order for an additional term."). Father never requested an extension of the order's duration, the parties never agreed to such an extension, and an extension was never entered. Accordingly, by March 2, 2017, i.e., the date of the Order now challenged by Father, the PFA order had expired.

**Second**, even if the PFA order still existed on March 2, 2017, no error occurred. Our courts have held that where equity demands – for example, when an order/judgment is procured by fraud – courts have the power to set aside their prior decisions. See Commonwealth v. Harper, 890 A.2d 1078, 1081-82 (Pa. Super. Ct. 2006) (citing Estate of Gasbarini v. Medical Center of Beaver County, Inc., 409 A.2d 343, 345 (Pa. 1979)). The Court believes that Father obtained the PFA order through fraud. Father moved this Court for a protection order upon the premise that he lived in AC with Child, see Father's January 8, 2014, Brief in Support of Jurisdiction at 1; that the Court had personal jurisdiction over Mother pursuant to 53 Pa. C.S. § 5402, i.e., the UCCJEA, see id. at 9; and that, as an alternative basis, the Court had personal jurisdiction over Mother pursuant to a constitutional minimum contacts analysis and that the exercise of

28

jurisdiction pursuant to such an analysis comported with "fair play and substantial justice" because, among other things, this Commonwealth has an interest in protecting one of its child residents, Father was a resident of Pennsylvania, and "Mother could easily have foreseen that she would be haled into court here as a result of her sexual abuse of a child who is a resident of this Commonwealth[.]" id. at 7-9.

None of the above, the Court now knows, was true. Father may have claimed an address in Pennsylvania, but he did not live here; he lived in Japan and merely traveled to Pennsylvania, despite his statements to the contrary.[13] Child also lived in Japan; and Pennsylvania, for the reasons set forth above, was never his home state. This Court also never had jurisdiction pursuant to the UCCJEA, and only appeared to have it as a result of Father's duplicity, as previously described.

Moreover, Mother – the Court believes – did not have sufficient minimum contacts with Pennsylvania to warrant exercising personal jurisdiction over her. Consider Father's arguments for said contacts:

> In this case, Mother's sexual abuse is unquestionably "purposefully directed" at a resident of the Commonwealth. Child resides in [AC], attends school here, and his primary physical and legal custodian, Father, resides here, as well. That Mother is not present in the Commonwealth currently is not relevant to the constitutional minimum contact analysis. Furthermore,

---

[13] See notes 1, 4 & 10, supra.

Mother has also "purposely avail[ed]" herself of the "privilege of conducting activities" in the Commonwealth and "invoking the benefits and protections of its laws." Mother was a party to a custody matter in this Commonwealth. She is presently protected by an order of this Court with respect to custody of the parties' minor children. In the summer of 2012, faced with a petition for contempt, Mother hired a Pennsylvania attorney in Harrisburg, presumably using either the postal service or telephone to do so. These services were carried out within the Commonwealth.

Mother's purposeful availment of the protections and benefits of the Commonwealth are also evidenced by virtue of the November 2, 2006 custody order, as amended. Our Superior Court has held that, particularly with respect to custody matters, the exercise of personal jurisdiction over the parties is appropriate by virtue of the custody order itself. . . .

In the instant case, Father and . . . [Child] are both residents of [AC]. While traveling in Japan, Child was abducted by Mother in April 2013. The parties remain subject to this Court's November 2, 2006 custody order, as amended. That the abuse Child has suffered at the hands of Mother occurred in Japan is of no moment for the purposes of this Court exercising jurisdiction over Father's petition and Mother personally. Father and Child remain residents of [AC], and, by virtue of this Court's exclusive continuing jurisdiction over the parties owing to the November 2, 2006 custody order, this Court may exercise jurisdiction over Mother personally to consider Father's PFAA petition. . . .

Id. at 5-7.

Said arguments equate to two broad contentions by Father. First, he repeatedly states and relies on the notion that he and Child lived in Pennsylvania and that this Court appropriately entered a custody order in 2006.

30

Those notions, as set forth above, are not just incorrect, they are also fraudulent. Second, Father asserts that Mother's hiring of counsel to represent her in contempt proceedings warrants a finding that personal jurisdiction exists. The Court does not consider such attenuated contacts to be sufficient contact to invoke personal jurisdiction over Mother. See Gaboury v. Gaboury, 988 A.2d 672 (Pa. Super. Ct. 2009) (affirming lack of personal jurisdiction where contacts with Pennsylvania were too attenuated); see id. at 674-75 (party's contacts with Pennsylvania deemed to be insufficient for personal jurisdiction in action filed in 2008 where party lacking jurisdiction moved to Pennsylvania in 2004, wed in Pennsylvania in 2005, and relocated to another state in 2006). Additionally, the Court does not consider any other contacts Mother had with Pennsylvania – which were elicited during the hearing – to be sufficient to exercise personal jurisdiction over her; they were too insignificant and remote in time.

The above reveals that Father initiated PFA proceedings in 2013 under fraudulent pretenses. He did not live in AC. Child did not live in AC. Mother did not live in AC and had virtually no contact with Pennsylvania after the parties' 2005 divorce. The conduct purportedly constituting abuse did not occur in AC (and was actually found not to be abuse in Japan after an investigation). Had the Court known the truth about the custody proceedings ongoing in Japan in 2013; that the parties had entered into a shared custody agreement in Japan in 2007, i.e., after this Court's 2006 custody order; and that none of the individuals

31

material to the alleged abuse – Father, Mother, and Child – truly lived in Pennsylvania; the Court would not have found personal jurisdiction over Mother or even that venue existed here as it now appears to the Court that Father merely came to AC to obtain the PFA order to use in the Japanese legal proceedings. See Pa.R.Civ.P. 1901.1 (venue appropriate where plaintiff resides, even if only temporarily, or is employed; where defendant may be served; or where the abuse occurred).

Accordingly, claim of error "c" lacks merit. Father has waived said claim through lack of specificity, the PFA order did not even exist when the March 2017 Order was signed and entered, and, moreover, the PFA order was obtained by fraud and therefore should be set aside in any event.

## VI. Evidentiary Claims

Father's evidentiary claims also lack merit. Claim "f" – i.e., the Court "erred by failing to admit certain evidence and testimony of the child's abuse" – is simply too vague for this Court to address. Accordingly, claim "f" is waived. See Lineberger, 894 A.2d at 148.

Claim "e" pertains to this Court's refusal to permit Father to call as witnesses "Dr. Bruce Chambers and Annette Tierny as applied to emergency jurisdiction." The Court made such a ruling, among other reasons, because Father's claim of emergency jurisdiction pertained to Child's purported need for

32

protection from sexual abuse by Mother. That issue had already been litigated in Japan, where – as set forth above – the allegations of abuse were investigated. Child, his brother, Mother, her current husband, among others, were interviewed; and ultimately Mother was awarded custody of Child, it was determined that Mother did not sexually abuse Child, and no criminal charges were filed by the Japanese authorities. Under such circumstances, the Court saw no legitimate reason to re-litigate the same issue. See Nelson v. Heslin, 806 A.2d 873, 876-77 (Pa. Super. Ct. 2002) (collateral estoppel "operates to prevent questions of law or issues of fact which have once been litigated and adjudicated finally in a court of competent jurisdiction from being relitigated in a subsequent suit" and applies where "(1) [a]n issue decided in a prior action is identical to one presented in a later action; (2) [t]he prior action resulted in a final judgment on the merits; (3) [t]he party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and (4) [t]he party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action" (citation omitted)). Claim "e" thus fails.

## VII.   Conclusion

This case has been an emotionally charged matter for several years, and one in which both parties have expended substantial resources and effort litigating in two countries. The Court knows that our appellate courts will review

33

this litigation with the diligence it deserves and with which, indeed, they review every case. That said, this Court feels compelled to reiterate its belief that Father has attempted to deceive and mislead it and the Superior Court in prior filings, see pages 1-13, supra, so that all involved enter the coming proceedings with what this Court believes to be the appropriate context for evaluating Father's conduct and arguments.

With the foregoing in mind, the Court believes it correctly determined that jurisdiction to make a custody determination for the parties' Child lies in Japan, not this Court. Father's attempts to argue to the contrary are not supported by credible evidence concerning the parties' and Child's residency status, the Japanese custody proceedings, the state of Japanese custody law, and the results of the Japanese investigation into Mother's alleged sexual abuse of Child. The March 2, 2017 Order granting in part Mother's Petition should, therefore, be affirmed.

BY THE COURT:

Dated: 4|11|17

_____ J.
Susan Evashavik DiLucente

34